## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:  )
                                   )
1818 New York Avenue N.E.           )       MISC. CASE No. _____
Suites 115, 117, and 204             )
Washington, D.C.  20002            )
                                   )       (UNDER SEAL)
_____)

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher Steinbauer, having been duly sworn and appointed as a Special Agent of

the United States Department of Health and Human Services Office of Inspector General Office

of Investigations ("HHS-OIG"), do hereby state as follows:

1.      I am a Special Agent with HHS-OIG and have been employed by such since

November 2007.  I am currently assigned to the Philadelphia Regional Office while my Field

Office is located in Washington, D.C.  I have previously investigated Home Health Care fraud in

the District of Columbia and I am aware of the rules and regulations for that program and how

unscrupulous Medicare and Medicaid providers exploit them.  From October 1998 through

November 2007, I served as a uniformed Police Officer for the United States Department of

Treasury, U.S. Mint Police and Bureau of Engraving & Printing Police respectively.  Overall, I

have served as a Federal Law Enforcement Officer for approximately sixteen (16) years.  I am a

graduate of both the thirteen (13) week Mixed Basic Police Training Program and the eleven

(11) week Criminal Investigator Training program at the Federal Law Enforcement Training

Center located in Brunswick, Georgia.  Through both of these training programs I have received

training to; investigate criminal activity, write accurate reports, provide testimony, collect

evidence and perform other basic Law Enforcement skills.  I have also attended a five (5) week

Special Agent Basic Training Program hosted by HHS-OIG that taught specific skills relating to

the investigation of Health Care Fraud.  I have authored multiple arrest and search/seizure

warrants relating to white collar crime matters, with an emphasis on Health Care fraud.  I hold a

dual bachelor's degree (B.S.) in Justice Studies and Political Science from Frostburg State

University as well as a master's degree (M.A.) in Criminal Justice with a concentration in

Computer Fraud Investigation from The George Washington University.

      2.      Based on the facts set forth in this affidavit, I submit that there is probable cause

to believe that a search of the businesses of Global Healthcare, Inc. ("GLOBAL"), and Flo-

Diamond, Inc., located at 1818 New York Ave, NE Suites 115, 117, and 204, Washington, D.C.,

20002 (collectively, the "PREMISES"); and the search of the residence of the owner of Global,

which are described in greater detail in Attachment A to this search warrant affidavit, will

uncover the evidence, fruits, and/or instrumentalities described in Attachment B, relating to

violations of 18 U.S.C. § 1347 (Health Care Fraud); 42 U.S.C. § 1320a-7b(a)(3) (Medicaid Fraud

– Concealing and Failing to Disclose); 18 U.S.C. § 1341 (Mail Fraud); 18 U.S.C § 1956

(Laundering of Monetary Instruments); and 18 U.S.C. § 1957 (Engaging in Monetary

Transactions in Property Derived From Specified Unlawful Activity).

      3.      The facts set forth in this affidavit are based on my personal knowledge and

review of records, documents, and other physical evidence obtained during this investigation, as

well as information obtained from witnesses and information conveyed to me by other law

enforcement officials.  Unless specifically indicated, all conversations and statements in this

affidavit are related in substance and in part only and are not intended to be a verbatim recitation

of such statements.

      4.      This Affidavit is being submitted for the limited purpose of establishing probable

cause to obtain search warrants.  Thus, it does not contain every fact known by me or the United

States.  Unless otherwise stated, the information in this Affidavit is either personal known tome

or has been provided to me by other law enforcement officers or is based on a review of various document and records.  This affidavit is not intended to include each and every fact relating to this investigation and only sets forth those facts necessary to establish probable.

## **STATUTES**

5.      Title 18, United States Code, Section 1347 provides that "[w]hoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be [guilty under this section]."

6.      Title 18, United States Code, Section 1341 provides in relevant part that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . deposits or causes to be deposited any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined under this title or imprisoned not more than 20 years, or both.

7.      Title 42, United States Code, Section 1320a-7b(a)(3) provides in relevant part that whoever "having knowledge of the occurrence of any event affecting (A) his initial and continued right to any such payment [under a Federal health care program] . . . conceals or fails to disclose such event with an intent to fraudulently to secure such payment either in a greater amount and quantity than is due or when no such payment is authorized . . . shall be guilty of a felony and upon conviction thereof fined not more than $25,000 or imprisoned for not more than five years or both."

8.      Title 18, United States Code, Section 1956, provides in relevant part "(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (B)  knowing that the transaction is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

9.      Title 18, United States Code, Section 1957, provides in relevant part "(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b) [a fine under title 18, United States Code, or imprisonment for not more than ten years or both]."

## Probable Cause

### Summary of Investigation

10.      The United States Attorney's Office for the District of Columbia, in conjunction with the Federal Bureau of Investigation ("FBI"), the U.S. Department of Health and Human Services Office of Inspector General ("HHS-OIG"), the District of Columbia Medicaid Fraud Control Unit ("MFCU"), the U.S. Secret Service ("USSS"), the Internal Revenue Service ("IRS"), the Department of Labor Office of Inspector General ("DOL-OIG"), the Social Security Administration Office of Inspector General ("SSA-OIG"), the Department of Homeland Security Immigration and Customs Enforcement ("ICE"), the Maryland MFCU, and others, have been conducting a multi-year investigation into the Medicaid fraud, kickbacks, and false billing

4

relating to home care services and home care agencies ("HCAs") in the District of Columbia

Medicaid program.  Subjects of the investigation include principals and employees of home

health agencies and staffing agencies, recruiters for home health agencies, and doctors

prescribing plans of care for home health services.  The investigation is on-going.

11.     Florence Bikundi, also known as Florence Igwacho and Florence Ngwe, has been

excluded from participation in all Federal health care programs, including Medicaid, since April

2000.  From July 2007 to the present, Florence Bikundi, in violation of her exclusion, has caused

three home care agencies that she controls, two named Global Healthcare, Inc., and one named

Flo-Diamond, Inc., to submit Medicaid claims to the District of Columbia and Maryland in

violation of her exclusion.  During this time period, the companies have received over $75

million in Medicaid payments.

### FLORENCE BIKUNDI

12.     Florence Bikundi is a native of Cameroon.  Following her 2003 criminal

convictions, discussed below, an Immigration Judge ordered her to be removed from the United

States.  However, the judge withheld her removal.  For the purposes of this Affidavit, Florence

Bikundi is referred to as Florence Bikundi except in circumstances in which she used the name

Florence Igwacho or Florence Ngwe, or in circumstances in which she is referred to as Florence

Igwacho or Florence Ngwe in any documents or records.

### Marriage and Family Members

13.     The Marriage Register for the Circuit Court of Fairfax County, Virginia, indicates

that on September 5, 2009, Florence Igwacho married Michael Davis Bikundi in Fairfax County,

Virginia.  Florence Igwacho and Michael Bikundi indicated on the marriage register that it was

the first marriage for both of them.  Florence Igwacho and Michael Bikundi filed U.S. income tax returns for the years 2007 and 2008 with the status of "married filing jointly."

14.     On her INS Form G-325A, "Biographic Information," dated February 29, 2008, Florence Bikundi wrote that in 1997, she married Michael Bikundi in Douala, Cameroon.  On her INS Form N-400, "Application for Naturalization," dated August 23, 2000, she indicated that she was single.

15.     As discussed in more detail below, Florence Bikundi has often used the name Florence Igwacho since her September 5, 2009, marriage to Michael Bikundi in Fairfax County, Virginia.

**Bankruptcy**

16.     On October 18, 2004, Florence Igwacho filed a Voluntary Petition for Bankruptcy, pursuant to Chapter 7 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Maryland.  On January 10, 2005, the Bankruptcy Court issued an Order discharging her debts and a Final Decree that her estate has been fully administered.

**Foreclosure of 15703 Appleton Court, Bowie, MD**

17.     On September 8, 2005, Florence Igwacho and Carlson Igwacho purchased the real property located at 15703 Appleton Court, Bowie, Maryland ("the Appleton Court property").

18.     On October 17, 2008, a notice of default on the mortgage for the Appleton Court property was recorded in Prince George's County, Maryland.  On March 18, 2009, an Order to Docket Foreclosure for the Appleton Court property was filed in Prince George's County Circuit Court.  The Appleton Court property was sold at public auction on December 3, 2010.

**False Statements on Loan Application**

19.     On September 23, 2009, Florence Igwacho purchased the real property located at 806 Jennings Mill Drive, Mitchellville, Maryland ("the Jennings Mill property") for $880,000.

6

On August 11, 2009, Florence Igwacho submitted a Uniform Residential Loan Application for a mortgage on the Jennings Mill property. The application is signed in the name of Florence Igwacho and contains numerous false statements.

20.     In section III of the application, Florence Igwacho lists her present address as 15703 Appleton Court, Bowie, Maryland. She indicates that she rents the property and has lived there for over five years. In Section VIII of the application, the "No" box is checked in response to question "m,": "Have you had an ownership interest in a property in the last three years?" On a "First-Time Maryland Home Buyer Affidavit," dated August 28, 2009, Florence Igwacho affirms that she "has never owned, in the State of Maryland, residential real property which has been [her] principal residence and that property herein conveyed will be occupied by the grantee[] as [her] principal residence." In Section VIII, question "f" of the application, the "No" box is checked in response to the question: "Are you presently delinquent or in default of any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee?" As previously discussed in paragraphs 21 and 22, Florence Igwacho and Carlson Igwacho owned the Appleton Court property until they defaulted on the mortgage in 2008, and the lender initiated foreclosure proceedings in 2009.

21.     In Section VIII of the application, the "No" box is checked in response to question "b": "Have you been declared bankrupt within the past 7 years?" As previously discussed in paragraph 20, on October 18, 2004, Florence Igwacho filed a Voluntary Petition for Bankruptcy, pursuant to Chapter 7 of the Bankruptcy Code, and on January 10, 2005, the United States Bankruptcy Court for the District of Maryland the Bankruptcy Court issued an Order discharging her debts. On the application, the "Yes" box is checked in response to question "j" in Section VIII, "Are you a U.S. citizen?" Florence Bikundi has never been a United States citizen.

22.     The purchase of the Jennings Mill property and the use of fraudulently obtained proceeds to pay off the mortgage are discussed in further detail below.

### Criminal History

23.     On October 9, 1998, Florence Igwacho was convicted of Theft of Property with less than $300.00 Value in District Court for Montgomery County.  On May 23, 2002, Florence Igwacho pleaded guilty in Prince George's County Circuit Court to Practicing Nursing without a License.  The court stayed the entry of judgment and placed the defendant on probation.  This type of disposition is commonly known as probation before judgment.

24.     On July 8, 2003, Florence Igwacho was convicted of two counts of Practicing Nursing without a License and one count of Identity Fraud in Baltimore City Circuit Court.  The factual basis for the conviction was that Florence Igwacho assumed the identity of an actual registered nurse who practiced in the District of Columbia and was licensed in Maryland.  Florence Igwacho presented the registered nurse's Social Security number, resident alien card, and Maryland nursing license to nurse staffing agencies.  The staffing agencies then obtained nursing positions for Florence Igwacho at Baltimore area hospitals.

### Revocation of Nursing Licenses

#### *Virginia*

25.     On August 4, 1999, the Virginia Board of Nursing ("the Board") issued an Order revoking Florence Igwacho's license to practice practical nursing.  The Findings of Fact state that "[on] or about October 15, 1998, by her own admission, Ms. Igwacho abandoned Patient A, a four (4) year old child, who is comatose ventilator dependent, with no cough reflex, and requires twenty-four (24) hour care, seven (7) days a week, in that she left the home to obtain a non-prescription medication for herself and failed to advise anyone that she was leaving the patient unattended."  The Findings of Fact also note that on or about October 8, 1998, Florence

Igwacho administered medications to Patient A at approximately 8:00 p.m., when the medications were ordered for administration at 6:00 p.m.

26.     Florence Igwacho submitted a Virginia Application for Reinstatement of License as a Licensed Practical Nurse, dated April 13, 2004.  In a letter to Igwacho, dated November 24, 2004, the Board advised her that she may have violated Title 54.1 of the Virginia Code and Board Regulations.  One potential violation referenced in the letter is that Igwacho answered "No" to the question "Have you ever been convicted, pled guilty to or pled Nolo Contendere to the violation of any federal, state or other statute or ordinance constituting a felony or misdemeanor?"  Another potential violation noted in the letter is that on an employment application, Florence Igwacho stated that she graduated from Bowie State with an RN, BSN, and graduated from Howard Community College and Anne Arundel Community College with an LPN.  Florence Igwacho only took courses at these institutions, and she never graduated from any of them.

27.     On December 29, 2004, the Board issued an Order denying Florence Igwacho's petition for reinstatement.  The Board found that Igwacho had in fact committed the violations discussed in the previous paragraph.

### *District of Columbia*

28.     On October 21, 2002, Florence Igwacho submitted a New License Application to the District of Columbia Department of Health seeking to be licensed as an L.P.N (Licensed Practical Nurse).  On June 20, 2003, Florence Ngwe submitted an application to be licensed as an R.N. (Registered Nurse).  Both applications required the applicant to "List all states and jurisdictions in which you have ever held a license."  In both responses, New York and South Carolina were listed, but Virginia was not.  Both applications asked "Has any authority taken

adverse action against your license or privileges or informed you of any pending charges not previously reported to this board?"  The "No" box was checked on both applications.

29.     On November 15, 2002, the District of Columbia Department of Health issued a license to Florence Igwacho as an L.P.N., and on September 4, 2003, it issued a license to Florence Ngwe as an R.N.

30.     On May 18, 2005, the District of Columbia Board of Nursing revoked both nursing licenses.  It cited her Baltimore City Circuit Court convictions, the revocation of her Virginia nursing license for abandoning a patient and failing to administer medications on schedule, and the false responses on her L.P.N. and R.N. applications.

## South Carolina

31.     Florence Igwacho was licensed to practice nursing in South Carolina until January 31, 2004, when her license lapsed.  Ference Igwacho filed an Application for Reinstatement, dated March 20, 2004.  The application is marked "No" in response to the question "Since you obtained (new licensees), or last renewed your license, have you: Been convicted, pled guilty, or pled nolo contendere for violating any federal, state, or local law, or do you have charges pending…?"

32.     On November 21, 2007, the South Carolina Board of Nursing permanently revoked Florence Igwacho's nursing license.  As the basis for its decision, the Board of Nursing cited: (1) Florence Igwacho's conviction for identity fraud; (2) her "willfully and repeatedly following a course of conduct that, by reasonable professional or ethical standards, renders [her] incompetent to assume, perform, or be entrusted with the duties, responsibilities, or trusts which normally devolve upon a licensed nurse;" and her attempt to obtain a nursing license "through fraud, deceit, and misrepresentation."

**Exclusion from Federal Health Programs**

33.     On September 7, 1999, HHS-OIG sent a letter[1] to Florence Igwacho informing

her that it was "considering excluding [her] from participation in the Medicare, Medicaid, and **all**

Federal health care programs as defined in section 1128B(f) of the Social Security Act (Act).

This action is predicated on the fact that your license was revoked, suspended or otherwise lost,

or because your license was surrendered while a formal disciplinary proceeding was pending for

reasons bearing on your professional competence, professional performance, or financial

integrity."  The letter provided Florence Igwacho with the opportunity to provide any

information for HHS-OIG to consider prior to making an exclusion determination.

34.     Florence Igwacho sent a handwritten letter to HHS-OIG responding to her

possible exclusion.  She acknowledged that her nursing license had been revoked.  In the letter,

she wrote:

>           Sir, I regret that I didn't respond in a timely manner because my son died
>           in Africa back in June and I had to travel back home.  I only returned
>           yesterday 10/5/99 where I received both your letter and the one from
>           Virginia Board of Nursing.  I was subpoenaed to appear for a hearing July
>           19th but it is most unfortunate that I couldn't make it not because I didn't
>           want to but because I was out of the country and at the time I didn't have a
>           lawyer to defend me.

35.     In her "Application for Naturalization" (Form N-400), dated August 23, 2000,

Florence Igwacho did not indicate that she had traveled to Africa at any time from June through

October 1999.  The only travel outside of the United States listed on the application is a trip to

Italy from December 5 to December 19, 1997, to attend her brother's graduation, and a trip to

Italy from December 16 to December 30, 1999, for a visit.  The travel section of the application

contains multiple markings in red pen, such as circles, underlines, and cross outs through lines

---

[1] Unless otherwise indicated, all quotations from letters or documents are written as they appear in the letter or
document.

that have no responses.  Immigration authorities have advised me that an examiner made the red

markings while reviewing the questions with Florence Igwacho and discussing her responses.

36.     On March 31, 2000, HHS-OIG sent a letter to Florence Igwacho notifying her that

she is "being excluded from participation in the Medicare, Medicaid, and **all** Federal health care

programs" because of the revocation of her Virginia nursing license.  The letter, which was sent

to the same address to which the September 7, 1999, HHS-OIG letter was sent, which was also

the same address from which Igwacho sent her October 6, 1999, response to the September 7,

1999, letter, explained that "[t]his program exclusion is effective 20 days from the date of this

letter and will remain in effect as long as your license is revoked, suspended, or otherwise lost.

Once your license has been returned to active status by the licensing board or agency taking the

disciplinary in the State of Virginia, you will be eligible to apply to the Office of Inspector

General for reinstatement to the Federal health care programs.  We have considered the

information you furnished to our field office in response to its letter to you."  The letter informed

Florence Igwacho that "**[o]btaining a license or obtaining a provider number from a**

**Medicare contractor, a State agency, or a Federal health care program does not reinstate**

**your eligibility to participate in those programs.**"

37.     The exclusion notice sent to Florence Igwacho included a document explaining

the authority for the exclusion and its effect.  The top of the document instructed Igwacho to

"**Please read carefully and retain.**"  It informed her that

> You are excluded from participation in the Medicare, Medicaid, and **all** Federal
> health care programs as defined in section 1128B(f) of the Social Security Act.
> The effect of your exclusion is that no program payment will be made for any
> items or services, including administrative and management services, (other than
> an emergency item or service not provided in a hospital emergency room)
> furnished, ordered, or prescribed by you, except as provided in regulations found
> at 42 CFR 1001.1901(c), during the period you are excluded.  Your exclusion
> affects only your ability to claim payment from those programs for items or

services you render; it does not affect your right to collect benefits under these programs.

This exclusion has national effect and applies to all Federal procurement and non-procurement programs and activities.

If you are an individual, program payment will not be made to any entity in which you are serving as an employee, administrator, operator, or in any other capacity, for any services including administrative and management services that you furnish, order, or prescribe on or after the effective date of this exclusion. . . .

Any service you provide is a non-covered service.  Therefore, you cannot submit claims or cause claims to be submitted for payment under any Federal health care program.  Violations of the conditions of your exclusion may subject you to criminal prosecution and the imposition of civil monetary penalties (42 U.S.C. 1320a-7a – 42 U.S.C. 1320a-7b). In addition, submitting claims or causing claims to be submitted or payments to be made by the programs for items or services you furnish, order, or prescribe, including management services or salary can serve as the basis for denying your reinstatement to the programs. . . .

<u>Obtaining a license or obtaining a provider number from a Medicare contractor, a State agency, or a Federal health care program does not reinstate your eligibility to participate in those programs.</u>

38.     According to an HHS-OIG Special Advisory Bulletin on the Effect of Exclusion from Participation, issued May 8, 2013, "[t]he prohibition on Federal health care program payment for items or services furnished by an excluded individual includes items and services beyond direct patient care."  "[A]n excluded individual may not serve in an executive or leadership role (e.g., chief executive officer, chief financial officer, general counsel, director of health information management, director of human resources, physical practice office manager, etc.) at a provider that furnishes items or services payable by Federal health care programs. Also, an excluded individual may not provide other types of administrative and management services, such as health information technology services and support, strategic planning, billing and accounting, staff training, and human resources, unless wholly unrelated to Federal health care programs."  "[A]n excluded person may own a provider, but may not provide any items or

services, including administrative and management services, that are payable by Federal health

care programs."

## THE MEDICAID PROGRAM

### Introduction

39.     Medicaid is a health insurance program established by Congress under Title XIX

of the Social Security Act of 1965 that provides health insurance coverage to individuals whose

incomes are below a certain financial threshold as measured against the poverty line.  Recipients

of medical services covered by Medicaid are referred to as Medicaid "beneficiaries."  Medicaid

is overseen and administered by the Centers for Medicare and Medicaid Services ("CMS"), an

agency within the United States Department of Health and Human Services ("HHS").  In the

District of Columbia, the federal government provides the funding for more than 70% of

Medicaid, with the District of Columbia providing the remaining funds.  Until September 30,

2008, Medicaid in the District of Columbia ("D.C. Medicaid") was administered by the

Department of Health's Medical Assistance Administration; however, since October 1, 2008, it

has been administered by the District's Department of Health Care Finance ("DHCF").  In

Maryland, Medicaid is also jointly funded by the federal and state governments, and is

administered by the Maryland Department of Health and Mental Hygiene.

40.     Medicaid is a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a

"Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

### Home Care Agencies

41.     In the District of Columbia, home care agencies ("HCAs") are authorized to

provide personal care services to D.C. Medicaid beneficiaries.  In Maryland, these entities are

known as home health agencies or residential service agencies, but are referred to herein as

HCAs.  Such services are provided by personal care aides ("PCAs") and are intended to assist

Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs include the ability to get in and out of bed, bathe, dress, eat out, and engage in toileting.

42.     In order to receive payments from Medicaid for providing covered PCA services, HCAs must submit an enrollment application to obtain a Medicaid provider number. Companies such as HCAs that are enrolled in Medicaid and purport to provide health care items or services to Medicaid beneficiaries are known as "providers." In the provider application, the HCA agrees to abide by all federal and local laws, regulations, and program manuals applicable to HCAs.

43.     Along with the Medicaid provider enrollment application, the HCA also signs a provider agreement. Among other things, the D.C. Medicaid provider agreement requires that the provider include: "A description of ownership and a list of major owners (stockholders owning or controlling five percent or more outstanding shares)." The provider agreement further specifies that D.C. Medicaid can reject or terminate the agreement if the "owners, officers, managers or other persons with substantial contractual relationships have been convicted of certain crimes or received certain sanctions as specified in Section 1128 of the Social Security Act." Further, in signing the provider agreement, the HCA and its authorized representative certify that they understand that payment of a claim by D.C. Medicaid is conditioned upon the claims and the underlying transactions complying with all relevant laws, regulations, and applicable program instructions, and on the HCA's compliance with all applicable conditions of participation in D.C. Medicaid.

44.     Providers accepted into the D.C. Medicaid program are given a unique provider identification number; only providers who have been assigned a provider number can submit claims for payment to Medicaid.

**Medicaid Claims Submissions**

45.     Once it obtains a provider number, an HCA can submit or cause the submission of claims to D.C. Medicaid for payment of PCA services that the HCA claims to have provided.  To receive payments from D.C. Medicaid, HCAs operating in the District of Columbia are required to submit a claim, either electronically or in paper form.  DHCF contracts with Xerox, formerly known as Affiliated Computer Services, Inc., to serve as its fiscal agent and receive and process claims submitted by D.C. Medicaid providers, including claims for PCA services.

46.     Once Xerox processes a claim, it sends the approved claim amount back to DHCF; DHCF then forwards the information to the D.C. Treasury, which pays the approved D.C. Medicaid claim either via check sent through the U.S. mail or via electronic fund transfer, whichever method the provider has requested.

47.     On each claim form that an HCA submits or causes to be submitted to D.C. Medicaid, the HCA has to identify certain information, such as the name of the Medicaid beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was purportedly provided, and the amount of money being claimed by the HCA as payment from D.C. Medicaid.  D.C. Medicaid only pays for services that were medically reasonable and necessary, and that were actually provided as claimed.  Maryland Medicaid works essentially the same way, however the claims are submitted directly to Maryland Medicaid.  Once the claims are approved, payments are sent by the state treasury to the provider, either via U.S. mail or via electronic deposit, whichever method the provider has requested.

48.     As discussed below, and based on my training and experience, Medicaid providers, including HCAs, generally maintain their books and records at their place of business. For HCAs, D.C. regulations require that medical records have to be kept for at least five years from the date the patient was discharged by the HCA, but at a minimum have to be preserved for

at least six years.  HCAs also have to maintain in their District of Columbia office the full and accurate personnel records of all employees and persons providing medical care or services. Such records have to include, among other things:

- the name, address, and social security number of each employee;

- a current professional license or registration for each employee;

- proof of education, training certifications, orientation, and in-service seminars; and

- proof of criminal background checks.

If an HCA offers a service such as personal care services that is provided by a third-party or contractor, such as an NSA, then the HCA has to have a written contract with the contractor that includes, among other things:

- a description of the services to be provided;

- the locations where services are to be provided;

- the procedures for developing plans of care, submitting clinical and progress notes, periodic patient evaluations, scheduling of visits, and other reports;

- the terms and procedures governing payment for services provided;

- the procedures used to manage and monitor the work of the contracted employees; and

- assurances that the contractor or staffing agency would comply with all applicable federal and District laws and regulations.

49.    Because this investigation is focusing on claims submitted to Medicaid from 2007 forward, there is probable cause to believe that the relevant records exist and are located in the location(s) to be searched.

**FLORENCE BIKUNDI'S USE OF HOME CARE AGENCIES TO OBTAIN MEDICAID
FUNDS IN VIOLATION OF HER EXCLUSION**

**Introduction**

50.     Florence Bikundi owns, controls, administers, and manages Global Healthcare
and Flo-Diamond.

51.     Between November 2009 and December 31, 2013, Global Healthcare received
over $75 million from the District of Columbia Medicaid Program.  Between January 2011 and
December 31, 2013, Global Healthcare received over $600,000.00 from the Maryland Medicaid
Program.  I have reviewed documents in which Florence Bikundi has been identified as a
Director, President, Owner, CEO, CFO, Director of Human Resources, and Administrator for
Global Healthcare.  I have also seen a Global Healthcare business card in the name of Florence
Bikundi with the title of Administrator, which was provided by Florence Bikundi to a financial
institution at which she banked.

**Global Healthcare**

**Corporate Registrations**

*Virginia*

52.     Between July 2007 and December 31, 2013, Flo-Diamond received over $2.7
million from the State of Maryland Medicaid Program.  I have reviewed documents in which
Florence Ngwe is named as the resident agent, Director, and Incorporator for Flo-Diamond;
Florence Igwacho is listed as the resident agent; and Florence Bikundi is identified as the Owner,
Director, CEO, Vice President, and resident agent.

53.     Commonwealth of Virginia State Corporation Commission ("SCC") records
indicate that Global Healthcare was formed on May 2, 2007.  Its current status is "terminated."
The principal office address is listed as 85 South Brag Street, Suite 500, Alexandria, Virginia.

18

*Maryland*

54.     Maryland State Department of Assessment and Taxation ("SDAT") records indicate that Global Healthcare has had two registrations.  The first registration was a Foreign Corporation Qualification filed on October 9, 2008, under SDAT identification number F12750428.  The Foreign Corporation Qualifications provides an address of 14531 Oakcluster Drive, Centerville, Virginia, and lists the Maryland principal office location as 600 Reisterstown Road, Suite 300A, Pikesville, Maryland.  Florence Bikundi is named as the resident agent with the same address as the Maryland office.

55.     On April 28, 2009, Florence Bikundi filed an "Application for Termination for a Foreign Corporation Qualification" for SDAT identification number F12750428.  The termination form lists the principal office in Maryland as 15703 Appleton Court, Bowie, Maryland, and the resident agent as Florence Bikundi with the same address.

56.     The second Maryland registration for Global Healthcare was on April 28, 2009, under SDAT identification number D13027735.  According to the Articles of Incorporation, Florence Bikundi formed Global Healthcare "to engage in the business of personal health care" and "[t]o carry on and transaction, for itself or for account of others, the business of . . . importers and exporters of natural products, raw materials, manufactured products and marketable goods."  Florence Bikundi is named as the resident agent and sole director.  The Articles of Incorporation list the address of Global Healthcare and Florence Bikundi as 15703 Appleton Court, Bowie, Maryland.  Florence Bikundi signed the Articles of Incorporation both as the person forming Global Healthcare and as the resident agent.  On February 23, 2011, Florence Bikundi, as the resident agent, filed a resolution changing the principal office address and resident agent address to 806 Jennings Mill Drive, Bowie, Maryland.  The current mailing address listed for Global Healthcare is 1818 New York Avenue, NE, Suite 204, Washington, DC.

Law enforcement agents have recently observed that Global Healthcare now occupies Suites 115 and 117 at 1818 New York Avenue, NE.

*District of Columbia*

57.     On January 24, 2008, the District of Columbia Department of Consumer and Regulatory Affairs issued a Certificate of Authority to Global Healthcare to transact business as a foreign corporation in the District of Columbia.  On April 4, 2008, Florence Bikundi, as President of Global Healthcare, filed a "Two-Year Report for Foreign and Domestic Business Corporations" with the District of Columbia Department of Consumer and Regulatory Affairs.

***Global Healthcare Submissions to District of Columbia Department of Health***

**Department on Disability Services Waiver Provider Enrollment
Application Package**

58.     Florence Bikundi, on behalf of Global Healthcare, submitted a Department on Disability Services Waiver Provider Enrollment Application ("DDS Waiver Application") to the District of Columbia Department of Health ("D.C. Department of Health").  The application was to provide services to mentally challenged adults.  It is dated March 17, 2008, and is signed by Florence Bikundi as "C.E.O."  "No" is checked in response to the following questions:  "10p) Has the applicant/provider ever been rejected or suspended from the Medicare or Medicaid program, or has your participation status ever been modified (terminated, suspended, restricted, revoked, limited, cancelled or sanctioned)?; 10q) With the last five (5) years, has the applicant provider ever been sanctioned, reprimanded or otherwise disciplined in any manner by any state licensing authority or other professional board or peer committee?"

59.     The DDS Waiver Application required Global Healthcare to attach a description of ownership.  Global Healthcare submitted a piece of paper with "Description of Ownership"

typed at the top.  The following is typed beneath the title: "1) Ms. Bikindi Igwacho Florence = 60%; 2) Earnest Igwacho = 20%; 3) Mr. Michael Davis Bikindi = 20%."

60.     The DDS Waiver Application also required Global Healthcare to attach "basic organizational documents."  The attached documents included: (1) a corporate resolution, dated May 2, 2007, naming Florence Bikundi as Director; (2) "Minutes of the First Meeting of Board of Directors," electing Florence Bikundi as President;[2] and (3) "Minutes of Annual Meeting of Shareholders of Global Healthcare," listing Florence Bikundi as owning 70% of Global Healthcare's shares, and Michael Bikundi, Ernest Igwacho, and Carlson Igwacho each owning 10%.

61.     The DDS Waiver Application included a consent form authorizing the District of Columbia Medical Assistance Administration to obtain all information relevant to the evaluation of the application.  Florence Bikundi signed the consent form as "Authorized Applicant/Provider."  As part of the consent form, Florence Bikundi "warrant[ed]" that all of her responses and information were "correct and complete to the best of [her] knowledge and belief."  Florence Bikundi also signed two separate forms for Request for Taxpayer Identification Number and Certification.

62.     Florence Bikundi signed the DSS Waiver Provider Agreement with the D.C. Department of Health.  She signed once as "Provider" and once as an individual "responsible to enforce compliance with the[] conditions" in the agreement.

## Medicaid Provider Application

63.     On June 3, 2009, Global Healthcare Services submitted a Medical Provider Application for a Home Health agency to the D.C. Department of Health.  "James

---

[2] The Minutes indicate that "Florence Bikundi RN" was present at the meeting.

Mbide/Florence Igwacho Bikundi" are listed as the contact names on the application. Global Healthcare submitted a Medicaid Provider Agreement with the application. The "Provider" signature on the agreement is in the name of James Mbide. Under the heading of "Signature of individuals responsible to enforce compliance with these conditions," Florence Bikundi signed as "Chief Executive Officer," and Dr. Ernest Igwacho signed as "Chief Medical Officer."

64.     Section 17 of the application includes the following questions: "(1) Have any of your professional licenses, in any state, ever been limited, sanctioned, voluntarily/involuntarily restricted, denied, revoked, suspended, surrendered, subjected to a consent order, placed on probation or cancelled?; (2) Have you ever been named a Defendant in any criminal case, other than misdemeanor traffic violation?; and (3) Have you ever been suspended from the Medicare or Medicaid program, or has your participation status ever been modified (terminated, suspended, restricted, revoked, limited, cancelled)?" "No" is checked in response to all of these questions. However, the individual listed as the "applicant" for the application is James Mbide, not Florence Bikundi.

65.     As part of the application, Global Healthcare was required to identify all individuals "having direct or indirect ownership or controlling interest" in the company. No individuals are listed in this section.

**Home Care Agency License Application**

66.     Florence Bikundi, on behalf of Global Healthcare, submitted a renewal application for a Home Care Agency License to the D.C. Department of Health. The application is dated January 19, 2010, and is signed by Florence Bikundi as the applicant and "CFO." The contact person listed for the application is "Ms. Bikundi Florence RN" with email addresses of florencebikundi@globalhealthcs.com and florencebikundi@yahoo.com. The $700.00 license fee

was paid with a Global Healthcare check signed by Florence Bikundi.  Florence Bikundi signed the "Home Care Agencies Insurance Verification Request Form" as the "HCA Official."

## Correspondence with the D.C. Department of Health

67.     Florence Bikundi sent a letter to the D.C. Department of Health, dated July 1, 2009, asserting that Global Healthcare Services did not need a Certificate of Need to provide non-skilled nursing services for a home health agency.  The title typed below her signature is "Administrator."

68.     Florence Bikundi sent a letter, dated January 12, 2010, to the Senior Deputy Director for the Health Regulation and Licensing Administration, in response to a letter about Global Healthcare's license renewal application.

69.     On March 13, 2012, Florence Bikundi sent an email to the Department of Health discussing monthly visits to a patient.  She listed her title as "Administrator" at the end of the email.  As discussed in further detail below, Florence Bikundi has also signed forms directing the District of Columbia to send Medicaid funds to Global Healthcare accounts at certain banks.  In one form, Florence Bikundi signed as "CFO or Authorized Representative."  In another form, she signed as the "Authorizing Official," and "Administrator" was written after her signature.

### *Global Healthcare Submissions to Maryland Department of Health and Mental Hygiene*

### **2010 Medicaid Provider Application**

70.     On April 5, 2010, Global Healthcare Services submitted a Medicaid Provider Application for the "Living at Home Waiver Program" to the Maryland Department of Health and Mental Hygiene ("Maryland Department of Health").  The application lists Michael Bikundi as the "Provider," but Florence Bikundi signed in the space for "Provider's Signature."    The address provided for Global Healthcare is 600 Reisterstown Road, Suite 300A, Pikesville, Maryland.  On the Provider Application Form, the name Florence Bikundi is crossed out as the

provider.  There is no name replacing the crossed out name of Florence Bikundi.  However, the Authorization section of the Provider Application Form names Florence Bikundi as the provider and is signed by her.

71.     The Provider Ownership and Control Form identifies Michael Bikundi and Florence Bikundi as the only officers or directors of Global Healthcare.  Michael Bikundi is listed as having a direct or indirect ownership interest of 5% or more, and Michael Bikundi and Florence Bikundi are listed as having a combination of direct or indirect ownership interest equal to 5% or more.  Florence Bikundi signed the ownership form as "Director of Human Resources."

72.     Florence Bikundi signed the Medicaid Provider Agreement between Global Healthcare and the Maryland Department of Health as "Provider."  The agreement requires Global Healthcare to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Medicaid recipients without "prior written approval."

## 2011 Medicaid Provider Application

73.     On April 20, 2011, Global Healthcare submitted a Medicaid Provider Application to the Maryland Department of Health.  The application lists the owners of Global Healthcare as Michael Bikundi and Florence Bikundi.  The address provided for Global Healthcare is 806 Jennings Mill Drive, Bowie, Maryland.  The Employer Identification Number ("EIN") listed on the application, 20-3396243, is the EIN for Flo-Diamond.  Michael Bikundi signed the application as the "Practitioner, Administrator or Authorized Professional Responsible for the Quality of Patient Care."  The Provider Ownership and Control Disclosure Form names Michael Bikundi and Florence Bikundi as officers or directors with each of them having a direct or indirect ownership interest of 5% or more.  Michael Bikundi signed the ownership form as "C.E.O."

74.     Michael Bikundi signed the Medicaid Provider Agreement between Global Healthcare and the Maryland Department of Health as "Provider."  The agreement requires Global Healthcare to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Medicaid recipients without "prior written approval."

**Flo-Diamond**

**Corporate Registrations**

*Maryland*

75.     SDAT records indicate that Flo-Diamond was formed on December 8, 2004. Florence Ngwe signed the Articles of Incorporation and is named as the resident agent, lone Director, and incorporator.  The articles provide an address of 7610 Wethersfield Place, Beltsville, Maryland for Flo-Diamond and Florence Ngwe.  According to the articles, Flo-Diamond will carry on lawful businesses and "also operate an Import/Export Business."

76.     On March 18, 2010, Florence Bikundi filed a "Resolution to Change Principal Office or Resident Agent" for Flo-Diamond.  The resolution provides that the new address for Flo-Diamond and Florence Bikundi is 600 Reisterstown Road, Suite 300A, Pikesville, Maryland. Florence Bikundi signed the resolution as the resident agent and the authorized person.

77.     On September 19, 2012, another "Resolution to Change Principal Office or Resident Agent" for Flo-Diamond was filed.  The resolution states that the new address for Flo-Diamond is 3042 Mitchellville Road, Bowie, Maryland.  The resolution is signed but I cannot read the name.  The name Florence Igwacho is printed in the field above the signature line for resident agent.

<u>*District of Columbia*</u>

78.     District of Columbia Department of Consumer and Regulatory Affairs records indicate that Flo-Diamond registered with the department on December 16, 2005.  Its current status is listed as "revoked."

<u>***Flo-Diamond Submissions to Maryland Department of Health***</u>

<u>**Provider Application for Medicaid Waiver for Older Adults**</u>

79.     On March 1, 2006, Flo-Diamond Healthcare Services submitted a Provider Application for Medicaid Waiver for Older Adults.  Michael Bikundi signed the application as "Provider."  A Medical Care Program application was also submitted.  The program application identifies Michael Bikundi as the owner of Flo-Diamond.  Michael Bikundi signed the program application as the person responsible for the "quality of patient care."  The Provider Ownership and Control Disclosure Form names Michael Bikundi as the sole officer or director and Carlson Igwacho as the sole person with a direct or indirect ownership interest of 5% or more.  Michael Bikundi signed the ownership form as "Administrator."

80.     Michael Bikundi signed the Medicaid Provider Agreement between Flo-Diamond and the Maryland Department of Health as "Provider."  The agreement requires Flo-Diamond to "not knowingly employ, or contract with a person," who "has been disqualified from providing or supplying services" to Medicaid recipients without "prior written approval."

81.     I have reviewed other submissions and applications from Flo-Diamond to the Maryland Department of Health.  Florence Bikundi signed some of these forms with different titles, including "Practitioner, Administrator or Authorized Professional Responsible for the Quality of Patient Care," "C.E.O.," "Provider," and "Vice President."  Florence Bikundi is also listed as an officer or director, contact person, and as having a direct or indirect ownership interest of 5% or more on some of the forms.  On June 20, 2007, Florence Bikundi, on behalf of

26

Flo-Diamond, signed a Trading Partner Agreement with the Maryland Medicaid program permitting Flo-Diamond to use a billing service to process transactions for Medicaid recipients.

82.     From at least 2007 through 2013, in addition to serving as director, officer, administrator, and owner of GLOBAL and FLO-DIAMOND, **BIKUNDI** was employed by and paid at least $302,200 in reported wages from GLOBAL and was employed by and paid at least $501,749 in reported wages from FLO-DIAMOND, all while she was excluded.

## INVESTIGATION BACKGROUND

83.     This case was referred to HHS-OIG, Office of Investigations, Washington Field Office, by DHCF Office of Program Integrity.  It was alleged that GLOBAL was billing D.C. Medicaid in a fraudulent matter by falsifying documents in order to obtain payment, billing for services not rendered, and soliciting Medicaid recipients with offers of kickbacks.  It was later discovered that GLOBAL improperly billed Federal health care programs for patient services allegedly furnished while an excluded individual – **BIKUNDI** – provided management and administrative services that were a necessary component of any patient care services.

84.     On April 4, 2011 law enforcement traveled to Global Healthcare Services at 1818 New York Avenue, N.E., to obtain billing records and the personnel file of C.F., a PCA paid by GLOBAL that DHCF had reported was not providing PCA services as claimed in GLOBAL's Medicaid billings.  Law enforcement was ushered into the office of the Administrator, Florence Bikundi.  Law enforcement informed BIKUNDI of the complaint of fraud concerning C.F. and asked for copies of C.F.'s records to support her timesheets.  BIKUNDI provided a personnel file, timesheets, and payroll checks for C.F.  Law enforcement informed BIKUNDI that additional requests would be forthcoming and she stated that all requests for records should be addressed to her.  On or about April 20, 2011, BIKUNDI mailed to the D.C. Office of Inspector General a copy of a letter, signed by BIKUNDI as Global's Administrator, purporting to

terminate C.F. from GLOBAL's employment.  GLOBAL never submitted corrected claims to

Medicaid for payments it received for false claims related to C.F.

### D.C. Department of Health Findings

85.     On or about January 5, 2011, the D.C. Department of Health ("DOH"), Health

Regulation and Licensing Administration, wrote to **BIKUNDI** and GLOBAL explaining that

DOH had conducted a survey at GLOBAL on December 7, 2010, and identified numerous

deficiencies (failure to follow D.C. regulations) that required a Plan of Correction response.

DOH is the regulatory authority in D.C. that issues licenses to home care agencies such as

GLOBAL.

86.     Many of the deficiencies identified revolved around GLOBAL's failure to have

documentation proving it complied with the requirements for PCAs to be licensed and providing

services billed to Medicaid, including:

- Failure to ensure that contracts for outside PCA services meet the license requirements;

- Failure to have health certificates certifying freedom from communicable diseases for all staff;

- Failure to have documentation of reference checks for all staff;

- Failure to comply with the provisions set forth in Health-Care Facility Unlicensed Personnel Criminal Background Check Act of 1998;

- Failure to maintain accurate and complete Plans of Care

- Failure to ensure PCAs report the condition, behavior, or appearance of each Medicaid beneficiary they allegedly treated.

87.     **BIKUNDI**, as GLOBAL's "Administrator," wrote a reply to DOH.  In my

knowledge and experience investigating health care providers, the term "Administrator" in the

health care field is a specialized term that connotes someone who controls the day to day

operations of a company, like a Chief Operating Officer or even Chief Executive Officer.  In a

follow-up letter from DOH to **BIKUNDI** and GLOBAL on or about October 12, 2011, DOH

explained that a second survey conducted in September 2011 revealed some of the deficiencies

still existed.  DOH conducted another survey in March 2012 and found additional deficiencies

still existed, meaning GLOBAL was not in compliance with the relevant rules and regulations

governing HCAs.

### Other Evidence of Wrong-Doing

88.      The federal investigation of GLOBAL, GLOBAL-MD, FLO-DIAMOND, and

BIKUNDI focused on BIKUNDI's use of the companies to obtain more than $78 million in

Medicaid payments in violation of the terms of BIKUNDI's exclusion from participation in

Federal health care programs, and the subsequent laundering of those funds.  That investigation

is described below.  However, other evidence of apparent fraudulent billings and other wrongful

conduct related to GLOBAL was also discovered.

89.      For example, from on or about November 9, 2007, through on or about October

11, 2013, submitted claims to D.C. Medicaid totaling approximately $494,711.04, for PCA

services GLOBAL claimed to have provided to at least 16 D.C. Medicaid beneficiaries.

However, the addresses where GLOBAL claimed to have provided those PCA services are all

either homeless shelters or D.C. Department of Human Services office locations, none of which

would permit the providing of PCA services.  Medicaid paid GLOBAL approximately

$492,721.08 for these false claims.

90.      In addition, S.B., a former office manager for FLO-DIAMOND and GLOBAL-

MD, informed federal agents that she witnessed BIKUNDI signing numerous forms that were

supposed to be signed by the nurse that actually examined the Medicaid beneficiary an then

prepared a plan of care.  BIKUNDI signed these forms indicating she was a nurse, even though

she did not have a nursing license in Maryland and her nursing licenses elsewhere had all been

revoked, as explained below.  S.B. also relayed that BIKUNDI told S.B. to fabricate documents in the PCA personnel files to make it appear as if the PCAs met regulatory requirements when in fact they did not.

## Medicaid Claims Submissions

91.     From on or about November 3, 2009, through in or around January 2014, GLOBAL submitted claims to the District of Columbia Medicaid program, totaling at least $76 million; Medicaid paid GLOBAL approximately **$75 million** for those claims.

92.     While D.C. Medicaid paid most of these claims by electronic deposit, a number of payments were sent to GLOBAL via U.S. mail, including for example the four claims identified below:

| Count | On or About Date Check Mailed | Check Number | Check Amount | Mailed From | Mailed To |
|-------|-------------------------------|--------------|--------------|-------------|-----------|
| **3** | 11/12/2009 | 7348361 | $231,367.20 | D.C. Treasury 441 Fourth Street, NW Washington, D.C. | GLOBAL-VA 1818 New York Ave Washington, D.C. |
| **4** | 12/17/2009 | 7367516 | $331,263.36 | D.C. Treasury 441 Fourth Street, NW Washington, D.C. | GLOBAL-VA 1818 New York Ave Washington, D.C. |
| **5** | 1/19/2010 | 7382609 | $92,877.12 | D.C. Treasury 441 Fourth Street, NW Washington, D.C. | GLOBAL-VA 1818 New York Ave Washington, D.C. |
| **6** | 12/06/2012 | 5039172 | $503,479.48 | D.C. Treasury 441 Fourth Street, NW Washington, D.C. | GLOBAL-VA 1818 New York Ave Washington, D.C. |

93.     From on or about October 1, 2010, through on or about October 18, 2013, GLOBAL-MD submitted approximately 4,439 claims to the Maryland Medicaid program totaling $662,296.75; Medicaid paid GLOBAL approximately $648,349.13 for those claims.

94.     From on or about July 2, 2007, through on or about September 25, 2013, FLO-DIAMOND submitted approximately 23,793 claims to the Maryland Medicaid program totaling approximately $2,604,873.15; Medicaid paid FLO-DIAMOND approximately $2,604,825.83 for those claims.

95.     During the same time period, BIKUNDI was paid or otherwise received from GLOBAL, GLOBAL-MD, and FLO-DIAMOND at least $10.3 million in Medicaid funds, as an employee, owner, administrator, and otherwise, all in violation of the terms of her exclusion and the laws and rules governing Medicaid.  Medicaid was the only know source of income for BIKUNDI and her husband.

### Money Laundering

96.     Extensive analysis by the United States Secret Service and others have revealed substantial evidence of money laundering and spending by BIKUNDI and her husband of the proceeds of the Medicaid fraud.  For example, BIKUNDI engaged in or caused the following transactions to occur, spending proceeds of money obtained improperly from Medicaid:

| Date | Amount | Monetary Transaction |
|---|---|---|
| January 23, 2013 | $25,000 | Check No. 438 drawn from Citibank account No. xxxxxx7466 payable to Porsche Silver Spring |
| June 21, 2013 | $56,000 | Check No. 1021 from Bank of America account No. xxxxxxxx6749 payable to Florence Bikundi |
| June 27, 2013 | $30,000 | Check No. 548 drawn from Citibank account No. xxxxxx7466 payable to Annapolis Motor Cars |

97.     Many of the suspect financial transactions involve deposits into an account in the name of CFC Home Trade and Investment, LLC ("CFC Home Trade and Investment").  CFC

Home Trade and Investment appears to be a shell corporation.  BIKUNDI also utilized a second shell corporation, Tri-Continental Trade and Development, Inc. ("Tri-Continental Trade and Development").

98.	Maryland State Department of Assessment and Taxation ("SDAT") records indicate that CFC Home Trade and Development was formed on October 12, 2012.  According to its Articles of Organization, CFC Home Trade and Development is engaged in real estate development.  Carlson Igwacho, the son of BIKUNDI, is listed as the resident agent.  The address provided in SDAT records for both CFC Home Trade and Investment and Carlson Igwacho as resident agent is 3042 Mitchellville Road, Bowie, Maryland, the same address SDAT records as the principal office of FLO-DIAMOND.

99.	Financial analysis has revealed that BIKUNDI has used these and other companies to launder money obtained from Medicaid, spending it on luxury cars, mortgage payments (including for 806 Jennings Mills Drive), and to fund college savings funds for her children.

100.	Agents and analysts have traced money from Medicaid, to GLOBAL, GLOBAL-MD, and FLO-DIAMOND, and then to CFC Home Trade and Investment, Tri-Continental Trade and Development, numerous banks and investment institutions, college savings plans for BIKUNDI's children and her husband's children, mortgage payments, luxury vehicles, overseas transfers of funds, and other laundering and expenses.  The financial aspects of this investigation, and probable cause to believe evidence of money laundering and spending exists at the premises, is more fully set forth in the affidavit of United States Secret Service Special Agent Nicole Hinson, which was contemporaneously submitted to this Court to support seizure warrants related to this case,  and a copy of which is attached hereto as Exhibit C and incorporated as if fully re-stated herein.

## LOCATIONS TO BE SEARCHED

## 1818 New York Ave, NW, Suites 115, 117, and 204, Washington, D.C.

101.     The 1818 New York Ave, NE location has been identified on numerous filings with various government agencies as the or a principal place of business for GLOBAL and GLOBAL-MD.  Filings with D.C. Medicaid, Maryland Medicaid, the D.C. Department of Consumer and Regulatory Affairs, and others, variously identify suites 115, 117, and 204 as GLOBAL or GLOBAL-MD addresses of record.  On or about January 24, 2014, law enforcement agents conducted surveillance on 1818 New York Ave., N.E., and confirmed that "Global Healthcare Inc" is operating in suites 115 and 117, and that numerous people were observed going in and out with what appeared to be checks.  Further surveillance revealed that suite 204 appears empty, but there are several closed rooms or closets inside of the suite that agents could not see into from the hallway.

## PROBABLE CAUSE THAT EVIDENCE EXISTS AT PREMISES TO BE SEARCHED

102.     Your affiant has reviewed the regulations governing HCAs licensed by D.C. and Maryland, and the applicable Medicaid regulations.  Among other HCA requirements, GLOBAL must maintain an office in the District of Columbia that contains complete and up-to-date records for every patient serviced by it and its sub-contractors.  GLOBAL must maintain all patient medical records for a minimum of at least six years.  In addition to patient records, GLOBAL must maintain in each of their respective offices full and accurate personnel records of all employees and persons providing medical care or services.  Retention requirements are similar in Maryland.  Based on my knowledge, training and experience, home care agencies, including GLOBAL and FLO-DIAMOND, maintain the books and records at the address registered with the applicable Medicaid program.

33

103.    In addition, your affiant has reviewed the regulations governing the District of

Columbia Medicaid provider activities, which states, "Providers shall retain, for a minimum of

six years (unless otherwise specified), medical and financial records that fully disclose the nature

and extent of the services rendered to recipients."  Based on my knowledge, training, and

experience, I know that health care providers keep records pertaining to their business for years.

Because this investigation is only focusing on claims submitted to D.C. Medicaid from 2009

forward, and to Maryland Medicaid from 2007 forward, there is probable cause to believe that

the relevant records exist and are located in the location(s) to be searched.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

104.    As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found.  One

form in which the records might be found is data stored on a computer's hard drive or other

storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage

media or, potentially, the copying of electronically stored information, all under Rule

41(e)(2)(B).

105.    *Probable cause*.  I submit that if a computer or storage medium is found on the

PREMISES, there is probable cause to believe those records will be stored on that computer or

storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer

files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

downloaded to a storage medium can be stored for years at little or no cost.  Even when files

have been deleted, they can be recovered months or years later using forensic tools.  This is so

because when a person "deletes" a file on a computer, the data contained in the file does not

34

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.      Based on review of claims submitted to Medicaid and other evidence, and based on my training and experience, I am aware that computer equipment, including facsimile machines, were used to generate, store, print, and submit documents used in the fraud scheme. Because GLOBAL, GLOBAL-MD, and FLO-DIAMOND are still submitting claims electronically to Medicaid, there is reason to believe such that there are computer systems and equipment currently located on the PREMISES.

106.    *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how

computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.       Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.       Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

107.    Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of PREMISES for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.        The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.        Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.        Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

108.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

109.    Based on the foregoing information and upon my training, and experience in the investigation of health care fraud, I believe there is probable cause to believe that fruits, instrumentalities and evidence of violations of 18 U.S.C. § 1347 (Health Care Fraud); 42 U.S.C. § 1320a-7b(a)(3) (Medicaid Fraud – Concealing and Failing to Disclose); 18 U.S.C. § 1341 (Mail Fraud); 18 U.S.C § 1956 (Laundering of Monetary Instruments); and 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity), as described in the Attachment B, are kept and concealed within the PREMISES listed in Attachment A (at 1818 New York Ave, NE Suites 115, 117, and 204, Washington, D.C., 20002).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Christopher Steinbauer
Special Agent
United States Department of Health and Human Services
Office of Inspector General


Subscribed and sworn to before me this_____
day of February 2014.


_____
ALAN KAY
United States Magistrate Judge